FILED

2015 Sep-29  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **TRACY MOTES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 6:14-CV-01370-MHH** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), plaintiff Tracy Motes seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Motes's claims for a period of disability and disability insurance benefits. After careful review, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Ms. Motes applied for a period of disability and disability insurance benefits on October 20, 2011. (Doc. 7-6, p. 18). Ms. Motes alleges that her disability began on April 30, 2007. (Doc. 7-3, p. 19). The Commissioner initially denied Ms. Motes's claims on January 25, 2012, and Ms. Motes requested a hearing

before an Administrative Law Judge (ALJ).  (*Id*.).  The ALJ issued an unfavorable decision on September 23, 2013.  (*Id.*, p. 29).  On May 12, 2014, the Appeals Council declined Ms. Motes's request for review, (*id*., p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference'" and her "'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's decision is supported by substantial evidence, the Court "must affirm even if the evidence preponderates against the

Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ evaluates:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Motes has not engaged in substantial gainful activity since April 30, 2007, the alleged onset date. (Doc. 7-3, p. 21). The ALJ determined that Ms. Motes suffers from the following severe impairments:

fibromyalgia, anxiety disorder, depression, and obesity. (*Id.*) Nevertheless, the ALJ concluded that Ms. Motes does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*, pp. 21–22). Next, the ALJ determined that Ms. Motes has the RFC:

> to perform light work as defined in 20 CFR 404.1567, except the claimant can lift and carry twenty pounds occasionally and ten pounds frequently; can sit for six hours in an eight-hour day; can stand and walk for six hours in an eight-hour day; can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs; can occasionally balance, stoop, crouch, kneel, and crawl; should avoid all exposure to workplace hazards such as dangerous machinery and unprotected heights; and can perform simple, routine, and repetitive tasks; can maintain attention and concentration for two-hour [sic] at a time; will work best in relative isolation, but may have occasional interaction with co-workers; can perform jobs that do not require interacting with the general public as part of the job duties; and will miss up to two days of work per month.

(*Id.*, pp. 22–23). Based on this RFC, the ALJ concluded that Ms. Motes is not able to perform her past relevant work as a payroll clerk and fast food worker. (*Id.*, p. 27). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Ms. Motes can perform, including assembler, hand packager,[1] and quality control inspector. (*Id.*, p. 28). Accordingly, the ALJ

---

[1] In her decision, the ALJ determined that Ms. Motes's "past relevant work exceeds[s] [her] residual functional capacity." (Doc. 7-3, p. 27). However, during the hearing, the ALJ noted that Ms. Motes worked as a hand packager from 1999-2006. (*Id.*, p. 49). Based on the vocational expert's testimony, the ALJ determined that Ms. Motes could perform this past work. (*Id.*, pp. 51, 28). If the ALJ erred in finding that Ms. Motes could work as a hand packager, the

determined that Ms. Motes is not disabled as defined in the Social Security Act. (*Id*.).

## IV.   SUMMARY OF MEDICAL EVIDENCE

The administrative record contains a small collection of medical records from treating physicians.   A handful of medical records from the Guin Clinic ranging from May 2001 through July 2006 are unremarkable with the exception of a record from July 2003 which reflects that Ms. Motes was taking Prozac.  (Doc. 7-8, p. 5).  There is a gap in Ms. Motes's medical records from 2006 until 2010.

From early 2010 through June 2011, Ms. Motes visited Lamar Medical Clinic.  Dr. R. Wayne Stevens, a general practitioner and treating physician, treated Ms. Motes on multiple occasions.  (Doc. 7-3, p. 24).  A September 2010 treatment note from Dr. Stevens states, "Patient suffers from fibromyalgia, depression and chronic intractable non-malignant pain.  Patient currently takes Prozac 40 mg daily . . . Depression, stable."  (Doc. 7-8, p. 28).  Medical records from Dr. Stevens from July, August, and October 2010 state that Ms. Motes was suffering from depression, and she routinely took 40 mg of Prozac daily.  (Doc. 7-8, pp. 26, 29-32).   Dr. Stevens's October 2010 medical record for Ms. Motes contains a diagnosis of "anxiety" and a prescription for Klonopin.  (Doc. 7-8, p. 24).  A subsequent nurse's note on a record from November 2010 contains the following

---

error is harmless because the ALJ found that other jobs exist in the national economy that Ms. Motes could perform.

remark: "Paxil is not helping." (Doc. 7-8, p. 21). Dr. Stevens's notes from the same visit contain the following pertinent information: "Anxiety disorder;" "I placed her on some Paxil for anxiety, and that isn't helping her much, she says;" and "d/c the Paxil [] Will just place her on Klonopin." (Doc. 7-8, p. 22). Records from Ms. Motes's January and April 2011 visits to the Lamar Clinic reflect that Ms. Motes was prescribed Xanax when she visited the clinic for "med refills." (Doc. 7-8, pp. 17, 19).

The record indicates that in 2011, Ms. Motes began seeing Dr. Kimberly Balasky, a general practitioner at Guin Medical Clinic. According to a note from June 2011, Ms. Motes was taking 20 mg of Prozac and 1 mg of Xanax. (Doc. 7-8, p. 38). Ms. Motes saw Dr. Balasky again in October 2011. The notes from those two visits are cursory. (*Id.*).

The Commissioner sent Ms. Motes to see Dr. Bryan Thomas for a mental examination in December 2011. (Doc. 7-8, p. 39). Dr. Thomas's notes indicate that Ms. Motes attended school through the 12th grade.[2] At the time of her visit, Ms. Motes was taking 60 mg of Prozac once per day and 2 mg of Zanax twice each day. (Doc. 7-8, p. 40). Dr. Thomas wrote that Ms. Motes's "current health issues include fibromyalgia, anxiety, depression." (Doc. 7-8, p. 40). Regarding Ms. Motes's daily activities, Dr. Thomas recorded that Ms. Motes "doesn't like to be

---

[2] Ms. Motes failed seventh grade and tenth grade. (Doc. 7-8, p. 40).

around a lot of people gets nervous" and "doesn't like to talk on the phone." (Doc. 7-8, p. 40). Dr. Thomas also reported with respect to Ms. Motes's psychiatric history that Ms. Motes "had outpatient treatment from Dr. Sheehan approximately 6-7 years ago because of anxiety and depression but stopped because of lack of insurance." (Doc. 7-8, p. 40). Ms. Motes reported that the treatment did not help. (*Id.* at 41).

Dr. Thomas noted that Ms. Motes's "[a]ffect is depressed and she cries frequently." (Doc. 7-8, p. 41). Ms. Motes reported the following mental health symptoms to Dr. Thomas:

> sleep impairment, anhedonia, feelings of guilty, feelings of worthlessness, impaired energy level, impaired concentration, appetite/weight problems, thoughts of death but denies plan/intent for suicide. Depression has been ongoing since 16 years old but at present level since 2007 when her husband was injured at work and again worsened in December 2009 when she found her sister dead from over-dose. She doesn't know why she is depressed.
>
> Claimant reports symptoms of post traumatic stress including: finding her sister dead from suicide, with the claimant responding with intense fear, helplessness of horror, with the claimant re-experiencing the event in a distressing way over the last month. She also reports trauma related to her husband nearly d[y]ing at work and being told that he likely would not live.
>
> She reports the following related to her sister's death: In the past month the following have occurred
>     -avoided thinking about or talking about the event
>     -avoided activities, places or people that remind claimant of the event
>     -become much less interested in hobbies or social activities
>     -felt detached or estranged from others

> In the past month the following have occurred
> > -especially irritable
> > -felt nervous or constantly on guard
> > -easily startled
>
> In the past month these problems have significantly interfered with work or social activities or causes [sic] significant distress.

(Doc. 7-8, p. 41).

Objective assessments that Dr. Thomas performed produced the following findings:  poor concentration; poor verbal abstraction, poor judgment concerning basic verbal problems; remote and recent memory adequate; poor immediate memory.  (Doc. 7-8, p. 41).  Dr. Thomas provided the following diagnosis for Ms. Motes:  major depression, post-traumatic stress disorder, "ability to perform routine repetitive tasks appears fair but persistence is likely poor," "ability to interact with coworkers appears questionable," "ability to sustain attention appears poor," and "ability to handle funds if so assigned appears adequate."  (Doc. 7-8, p. 41).  Dr. Thomas added:  "Prognosis for improvement over the next 12 months appears questionable/poor without treatment."  (Doc. 7-8, p. 42).

The Commissioner sent Ms. Motes to see Dr. Boyde J. Harrison in January 2012 for a "medical examination."  (Doc. 7-8, p. 56).  At the time of her visit, Ms. Motes reported that she was taking 2mg of Xanax twice daily and 60mg of Prozac per day.  (Doc. 7-8, p. 58).  Dr. Harrison noted a family history of depression and PTSD.  (Doc. 7-8, p. 57).  Dr. Harrison's evaluation focused on Ms. Motes's

physical symptoms.  He examined her vital signs, her vision, her hearing, and her chest, abdomen, musculoskeletal, and neurological symptoms.  (Doc. 7-8, pp. 58-59).  With respect to his neurological examination, Dr. Harrison noted that "the traditional trigger points associated with fibromyalgia were not endorsed."  (Doc. 7-8, p. 59).  Dr. Harrison opined:  "(1) Patient has mild depression (2) Patient likely has substance dependence which increases her depression, decreases her motivation (3) Myalgia secondary to inactivity. . . .  In my opinion, the patient should be treated for iatrogenic substance dependence and encouraged to exercise, encouraged to remain in the work place."  (Doc. 7-8, p. 59).

Dr. Balasky completed three assessments of Ms. Motes and one declaration for purposes of Ms. Motes's application for Social Security benefits.  The first assessment, labeled "Medical Opinion re: Ability to do Work-Related Activities (Mental)" is dated September 13, 2012.  (Doc. 7-8, pp. 78-79).  That document asks:  "please give us your opinion **based on your examination** of how your patient's mental/emotional capabilities are affected by the impairment(s)."  (Doc. 7-8, p. 78) (emphasis in original).  In that assessment, Dr. Balasky stated that she anticipated that Ms. Motes's impairments would cause her to be absent from work "more than four days per month."  (Doc. 7-8, p. 78).

The second assessment entitled "Statement of Treating Physician" is dated October 8, 2012.  (Doc. 7-8, pp. 72-77).  Dr. Balasky made a diagnosis of "chronic

joint and muscle pain, depression, [and] fatigue," and listed Ms. Motes's prognosis as "fair." (*Id.*, p. 72). Dr. Balasky opined that the symptoms would "rarely" preclude the requisite level of attention for performing simple work tasks and that in the work environment "moderate stress" would be acceptable. (*Id.*, p. 73). Dr. Balasky also indicated that Ms. Motes was capable of sitting for two hours and standing for forty-five minutes at a time; that she could sit for a total of six hours and stand or walk for two hours during an eight-hour workday; and that Ms. Motes's impairments would cause her to miss two days of work per month. (*Id.*, pp. 74–76). In her assessment of Ms. Motes's mental abilities, Dr. Balasky characterized Ms. Motes as being "unlimited or very good" in twenty categories, "limited but satisfactory" in two categories, and "seriously limited but not precluded" in three categories. (*Id.*, p. 78–79). In that report, Dr. Balasky indicated that Ms. Motes's impairments would cause her to have good and bad days and to miss work "[a]bout two days per month." (Doc. 7-8, p. 56).

The final assessment titled "Physician Assessment of Fibromyalgia" is dated October 23, 2012. (Doc. 7-8, pp. 70-71). In it, Dr. Balasky checked boxes indicating that Ms. Motes presented with signs of "fatigue," "depression," and "chronic fatigue syndrome." (Doc. 7-8, p. 70). Dr. Balsky opined that these symptoms could be attributed to Ms. Motes's fibromyalgia and that all other possible conditions had been excluded. (*Id.*, p. 71).

In the declaration that she executed on December 4, 2012, Dr. Balasky stated that she offered the declaration "to clarify [] comments that [she] made in response to two questionnaires about [Ms. Motes]." (Doc. 7-8, p. 80).  She explained:

> It has come to my attention that my responses to these questionnaires might appear to be inconsistent, and now that they have been brought to my attention, I hope to clear up any potential misunderstandings. Ms. Motes's primary disabling condition is her depression.  She reports some symptoms of physical pain, but those physical symptoms are most often secondary to her flare ups in her depression.  However, her depression does not completely account for all of her physical symptoms, which is why I have given her a separate diagnosis of fibromyalgia.  When I completed the separate questionnaires . . . I was attempting to separate the limiting effects of her depression from the limiting effects of her depression [sic].  In other words, I would expect that her fibromyalgia would cause her to be absent from work about two days per month, and her depression would cause her to be absent from work more than four days per month.
>
> I also have been asked to explain why I indicated that Ms. Motes would be absent 'more than four days per month' due to her depression, but that I marked that she would have 'unlimited or very good' abilities in most areas on the questionnaire.  That is the nature of depression.  Many patients with depression will be able to function nearly normally on most days.  Often they will find the effort to maintain function at a normal level to be very taxing, but they manage to cope with their symptoms in order to do what they need to do. However, when their symptoms flare up, they may find themselves unable to function at a level that is necessary to adequately perform their jobs.  They may find themselves unable to keep their minds focused on the task at hand.  Their symptoms may have outward signs that can be distracting to others.  They may often perform at a much slower pace than normal, which may cause problems with tardiness and lapses in productivity.  Even if they manage to arrive at their place of work on days when their symptoms flare up, often patients with depression will be unable to sustain their coping efforts long enough to complete the work day.  My comments on the 'Medical Opinion Re: Ability to Do Work-Related Activities (Mental)'

questionnaire for Ms. Motes were intended to reflect the nature of her depression flares.  On most days, she may struggle in some areas to cope, but she will be able to 'soldier on' so to speak.  However, I expect that she would have flare ups in her depression more than four days per month, and on those days, she would not be able to keep her mind on her job well enough to attend work that day.

(Doc. 7-8, pp. 80-81).

## V.    ANALYSIS

Ms. Motes argues that she is entitled to relief from the ALJ's decision because the ALJ failed to properly weigh the opinions of Dr. Balasky and Dr. Thomas.   Well-settled standards guide the Court in evaluating Ms. Motes's arguments.

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240–41 (11th Cir. 2004).   In the absence of sufficient particularity, the Court "cannot determine whether substantial evidence supports the ALJ's decision." *Denomme v. Comm'r, Soc. Sec.*, 518 Fed. Appx. 875, 877 (11th Cir. 2013) (citing *Winschel*, 631 F.3d at 1179).   An ALJ must give the opinion of a treating physician "substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v.* 357 F.3d at 1240-41. Typically, an examining physician's opinion receives more weight than that of a non-examining physician. *See Gray v. Comm'r of Soc. Sec.*, 550 Fed Appx. 850 (11th Cir. 2013).   "However, in evaluating a physician's opinions, 'the [ALJ] may reject any medical opinion,' including that of a treating

or consulting physician, 'if the evidence supports such a contrary finding.'" *Aderholt v. Astrue*, 2012 WL 2499164, at *2 (N.D. Ala. June 26, 2012) (quoting *Syrock v. Heckler,* 764 F. 2d 834, 835 (11th Cir.1985)). An ALJ may give less weight to the opinion of a treating physician if the ALJ articulates good cause for doing so. Examples of good cause include instances "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F. 3d at 1179.

An ALJ owes no deference to the opinion of a one-time examining physician. *Eyre v. Comm'r, Soc. Sec. Admin.*, 586 Fed. Appx. 521 (11th Cir. 2014) (citing *McSwain v. Bowen,* 814 F.2d 617, 619 (11th Cir.1987)). And an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. 2006). With these standards in mind, the Court considers Ms. Motes's arguments.

### A. Dr. Balasky

Of the psychologists and physicians whose opinions the ALJ discussed, only Dr. Balasky arguably rises to the level of a treating physician. The ALJ gave Dr. Balasky's opinion "only some weight." (Doc. 7-3, p. 25).

The Court is not convinced that Dr. Balasky qualifies as a treating physician. "A treating source (i.e., a treating physician) is a claimant's own physician,

psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment and who has, or has had an ongoing treatment relationship with you." *Nyberg v. Comm'r of Soc. Sec.,* 179 Fed. Appx 589, 591 n. 3 (11th Cir. 2006) (internal quotations omitted). The assumption underlying the weight accorded to the opinions of treating physicians is that "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) . . . ." C.F.R. § 404.1527(d)(2).

The administrative record indicates that Ms. Motes had only two visits with Dr. Balasky, one in June 2011 and one in October 2011. (Doc. 7-8, p. 38). The one page of notes that documents both visits contains almost no information about Dr. Balasky's examination of Ms. Motes. (*Id.*). The "Statement of Treating Physician" form that Dr. Balasky completed in the fall of 2012 asked Dr. Balasky to indicate "Nature, frequency, and length of contact." (Doc. 7-8, p. 72). Dr. Balasky replied, "general medical care since"—Dr. Balasky did not complete the sentence. (*Id.*).

On this record, Dr. Balasky's opinions are not due the deference that an ALJ must accord to a treating physician. *See Chaney-Everett v. Astrue*, 839 F. Supp. 2d 1291, 1303 (S.D. Fla. 2012) (finding that a physician who saw a claimant only twice "did not have an ongoing treatment relationship" with the claimant and therefore did not qualify as a "treating source"); *Casher v. Halter*, 2001 WL

294921 at *12 (S.D. Ala. Mar. 29, 2001) (because claimant only saw a physician twice, it was questionable whether he was a treating physician under the regulations).  Dr. Balasky falls somewhere between a treating physician and a one-time examining physician.[3]

The ALJ determined that Dr. Balasky's opinion that Ms. Motes's would have depression flare-ups more than four days a month was "inconsistent with the record as a whole," particularly Dr. Steven's treating notes that span several years. (Doc. 7-3, p. 25; Doc. 7-8, pp. 16–34).  The ALJ also noted that "many of [Dr. Balasky's] opinions regarding [Ms. Motes's] abilities were contradictory to each other."  (Doc. 7-3, p. 25).  For example, the ALJ found that Dr. Balasky's conclusion that Ms. Motes was limited to a less than sedentary range of work was belied by her findings that Ms. Motes could endure moderate stress and had mental abilities described as "unlimited or very good" in over three quarters of the abilities evaluated.  (Id.).  In no category was Ms. Motes rated as either "unable to meet competitive standards" or "no useful ability to function".  (Doc. 7-8, pp. 78–79). The ALJ also noted that Dr. Balasky's conclusion that Ms. Motes "would 'rarely' have pain that would preclude the level of attention and concentration needed to perform simple work tasks" was inconsistent with her determination that the

---

[3]  Ms. Motes's testimony from the hearing before the ALJ suggests that Ms. Motes sees Dr. Balasky more frequently than the physician's documents in the administrative record suggest, but Ms. Motes offered no concrete information about the nature or frequency of her visits with Dr. Balasky.  (See Doc. 7-3, pp. 41-42).

plaintiff was likely to miss four or more days of work per month. (Doc. 7-3, p. 25).[4]

In reaching these conclusions, the ALJ confused Dr. Balasky's opinions regarding Ms. Motes's physical impairments with Dr. Balasky's opinions regarding Ms. Motes's mental impairments. Ms. Motes submitted a declaration from Dr. Balasky to address some of the confusion that the ALJ had expressed.

In her declaration, Dr. Balasky explained that "Ms. Motes's primary disabling condition is her depression. However, her depression does not completely account for all her physical symptoms, which is why I have given her a separate diagnosis of fibromyalgia." (Doc. 7-8, p. 80). Dr. Balasky commented that in her assessments, she attempted to separate the effects of these conditions, but that, in sum, she "would expect that [Ms. Motes's] fibromyalgia would cause her to be absent from work about two days per month, and her depression would cause her to be absent from work more than four days per month." (*Id.*, p. 81). To reconcile the apparent inconsistency in her assessment of Ms. Motes's mental abilities, Dr. Balasky explained "[m]any patients with depression will be able to function nearly normally on most days. . . . However, when their symptoms flare

---

[4] The distinction between absence from work for two days versus four days is significant because the vocational expert testified that if Ms. Motes were to miss more than two days of work per month, "[t]hat would preclude performance of all work, especially at the unskilled level." (Doc. 7-3, pp. 54-55).

up, they may find themselves unable to function at a level that is necessary to adequately perform their jobs." (*Id.*).

The ALJ found that, notwithstanding her clarification, Dr. Balasky's opinion was inconsistent both internally and with the medical evidence as a whole. The ALJ provided two reasons for finding Dr. Balasky's opinion inconsistent. The ALJ determined that Dr. Balasky's findings were at odds with the more substantial treatment provided by Dr. Stevens, and the ALJ reasoned that if Dr. Balasky's clarification was accurate, then Dr. Balasky would have referred Ms. Motes for psychiatric care to treat the primary disabling impairment. (Doc. 7-3, p. 25). These rationales have intuitive appeal, but they do not provide a sufficient basis for the ALJ's treatment of Dr. Balasky's opinion.

The Court struggles to find inconsistency between Dr. Stevens's treatment records and Dr. Balasky's treatment records. Dr. Stevens consistently treated Ms. Motes for depression and anxiety, adjusting her medications over time to try to find the most effective treatment. (Doc. 7-8, pp. 17-32). In one record, Dr. Stevens described Ms. Motes's depression as stable (Doc. 7-8, p. 28); but another record states "Paxil is not helping" (Doc. 7-8, p. 21). Dr. Stevens's records contain no details about Ms. Motes's depression or her anxiety. Nowhere does Dr. Stevens express an opinion about the frequency of Ms. Motes's depression flare-ups, nor does he indicate how often Ms. Motes would be forced by her impairments to miss

work.  The brevity of Dr. Stevens's notes does not dictate the conclusion that Dr. Stevens's findings and Dr. Balasky's findings are at odds.  Indeed, virtually all of Ms. Motes's medical records are bare-boned.

In addition, Dr. Balasky's apparent failure to refer Ms. Motes for treatment from a mental health specialist is inadequate justification for according Dr. Balasky's opinion only some weight.  "[L]ack of evidence alone is not sufficient to support a finding that an impairment did not exist at a disabling level of severity." *Spellman v. Shalala*, 1 F.3d 357, 363 (11th Cir. 1993).  Uncontroverted evidence in the record demonstrates that Ms. Motes could not have afforded such treatment. (Doc. 7-3, p. 42).  Indeed, the record shows that Ms. Motes received outpatient psychiatric treatment in 2004 or 2005 for anxiety and depression, but she stopped attending the therapy sessions because of lack of insurance.  (Doc. 7-8, p. 40).  It is undisputed that Ms. Motes had no insurance when she applied for Social Security benefits.  An ALJ's reliance on a claimant's failure to obtain treatment is error when the claimant has a legitimate excuse such as poverty.  *Dawkins v. Bowen*, 848 F.2d 1211, 1212 (11th Cir. 1988) (holding "that a claimants inability to afford a prescribed medical treatment excuses noncompliance").  Thus, such a rationale cannot afford a substantial basis for giving limited weight to Dr. Balasky's opinion.

In the final analysis, though the Court rejects the rationale that the ALJ offered for her finding, the Court concludes that the ALJ did not err in giving Dr. Balasky's opinion "only some weight," because on the record before the Court, Dr. Balasky is not a treating physician, so her opinion is not entitled to deference. Because the only two (half-page) treatment notes from Dr. Balasky in the administrative record precede by more than one year the written assessments of Ms. Motes that Dr. Balasky prepared for purposes of Ms. Motes's benefits claim, the Court cannot conclude from the record that Dr. Balasky is in a position to provide a detailed, longitudinal picture of Ms. Motes's medical impairments of depression and anxiety.   Therefore, Dr. Balasky's opinion is entitled to some weight.

**B.    Dr. Thomas**

Dr. Thomas performed a consultative examination on December 22, 2011. After conducting a mental status evaluation and reviewing Ms. Motes's self-reported symptoms, Dr. Thomas diagnosed Ms. Motes's with "major depression vs. depression not otherwise specified" and "post traumatic stress disorder." (Doc. 7-8, p. 41).  Dr. Thomas opined that Ms. Motes's work skills were "likely poor" as was her "[p]rognosis for improvement."   (Doc. 7-8, pp. 41-42).   The ALJ determined that Dr. Thomas's opinion was entitled to no weight because "it is so inconsistent with the objective medical evidence as a whole."  (Doc. 7-3, p. 26).

19

Significantly, of all of the medical sources in the record, Dr. Thomas is the only psychologist who personally evaluated Ms. Motes.   The ALJ gave Dr. Thomas's opinion no weight because of inconsistencies between Dr. Thomas's findings and the record as a whole.   The ALJ noted:

> [t]he claimant reported to Dr. Thomas symptoms of sleep impairment, anhedonia, feelings of guilt, feelings of worthlessness, impaired energy level, impaired concentration, appetite/weight problems, and thoughts of suicide with no plan.   However, the claimant has never reported any of these symptoms in the past, in particular, to Dr. Stevens who treated the claimant for multiple years.

(Doc. 7-3, p. 26).  Ms. Motes's takes issue with the ALJ's reliance on the silence in the treatment history that Dr. Stevens provided with respect to Ms. Motes's psychological symptoms.   Such silence, though, "is equally susceptible to either inference, therefore, no inference should be taken."   *Lamb v.* Bowen, 847 F. 2d 698, 703 (11th Cir. 1988).   And Dr. Stevens is a medical doctor, not a psychologist or a psychiatrist.   Still, one would expect Dr. Stevens and Dr. Balasky to note in Ms. Motes's medical records suicidal reports from Ms. Motes.   Neither did.

The ALJ found additional support for her decision to reject Dr. Thomas's opinion in the report of Dr. Harrison, a one-time examining physician who conducted a medical examination of Ms. Motes.   In addition to his findings regarding Ms. Motes's physical symptoms, Dr. Harrison noted that Ms. Motes suffered from "mild depression" and "likely substance dependence which increases her depression, [and] decreases her motivation."  (Doc. 7-8, p. 59).  Dr. Harrison

20

opined that Ms. Motes should be treated "for substance dependence and encouraged to exercise, [and] encouraged to remain in the workplace." (*Id.*). Although Dr. Harrison was a medical examiner tasked with evaluating Ms. Motes's physical symptoms, he stands in the same posture as Dr. Stevens and Dr. Balasky with respect to his diagnosis of depression. The record supports Dr. Harrison's impression of "likely substance dependence."

The ALJ was sufficiently clear in her reasons for rejecting the opinion of Dr. Thomas. Although the undersigned would not go so far as to say that Dr. Thomas's opinion should be accorded no weight, the record as a whole suggests that Ms. Motes may have exaggerated some of her symptoms when she visited Dr. Thomas.

### C. Other Opinions Supporting the ALJ's Decision

In addition to Dr. Harrison's opinion, the ALJ considered the opinion of Dr. Robert Hughes, M.D., a non-examining medical expert who prepared a state agency physical assessment. (Doc. 7-8, pp. 60-63). The ALJ accorded Dr. Hughes's opinion "some weight because evidence received at the hearing level shows that [Ms. Motes] is more limited than determined by [Dr. Hughes]." (Doc. 7-3, p. 26). Dr. Melissa Jackson, Ph.D. and Dr. David Hill, Ph.D. are non-examining psychologists who performed state agency medical assessments. (Doc. 7-8, pp. 43-54, 64-68). Drs. Jackson and Hill concluded that Ms. Motes is not

disabled.  (Doc. 7-8, pp. 43-54, 64-68).  The ALJ accorded the opinions of these medical experts "great weight because they are consistent with the objective medical evidence." (Doc. 7-3, p. 27).

## V.    CONCLUSION

The Court strongly suspects that the administrative record in this case does not tell the whole story, but the Court must limit its review to the record.  The Court is mindful too that Ms. Motes bears the burden of proving that she is disabled.  *Hubbard v. Comm'r of Soc. Sec.*, --- Fed. Appx. ---, 2015 WL 4508768, at * 5 (11th Cir. 2015) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005)).  Were she able to establish a more extensive relationship with Dr. Balasky, the Court might reach a different conclusion.  The record leaves little doubt that Ms. Motes has struggled with depression for years, and Dr. Thomas's report indicates that Ms. Motes's depression has legitimate roots in a number of challenging experiences.   The record also demonstrates that beyond routine medication refills for Prozac and Xanax (and a number of other prescription medications), Ms. Motes has received little treatment.  On the record before it, the Court concludes that substantial evidence supports the ALJ's conclusion, even if the evidence and the reasonable inferences from that evidence preponderate against the Commissioner's conclusion.    Accordingly, the Court affirms the

Commissioner's decision.    The Court will enter a separate final judgment consistent with this memorandum opinion.

      **DONE** and **ORDERED** this September 29, 2015.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE